## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| JAMES LARKIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:18-cv-00065-JVB-JEM |
| | ) | |
| JEFFREY ARMSTRONG et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, by counsel, respectfully submit this memorandum of law in support of their motion for summary judgment.

### INTRODUCTION

Early in the afternoon on April 10, 2018, prison officials in the Westville Control Unit shook down several inmates' cells, including Plaintiff James Larkin's cell. Members of the emergency squad conducted a visual strip search on Larkin and then secured him in the inside recreation pad with other inmates while their cells were searched. Upon returning to his cell, Larkin became irate because he was missing his legal papers and some other personal property. In an attempt to get Defendant Armstrong's attention, Larkin threw water on Officer McGowan, which constituted battery on staff with liquid. As a result, officers ordered Larkin to submit to mechanical restraints so that they could "strip cell" him, meaning remove any and all items from his cell that could be used to

1

harm himself or others. Larkin refused these orders, and Defendant Eakins, the shift supervisor, ordered a cell extraction so that Larkin could be strip celled.

Prior to the cell extraction, non-party Sergeant Bowen ordered Larkin to "cuff up" (submit to mechanical restraints) three times, and Larkin refused each time. Sergeant Bowen administered OC spray (pepper spray) after each refusal. Larkin was irate, saying things like "tell those motherf****** to get their b****-a**es in here" and "you wanna cuff this d*** up?" Just before the cell extraction team entered the cell, Larkin announced: "First man who comes through that door, I'm f***ing him up."[1] Upon entering the cell, Larkin attacked the cell extraction team with OC spray that he had collected in a bag. He attempted to grab one of the first team members who entered and throw the officer behind him. At some point, Larkin's eyebrow split open, resulting in a gash roughly an inch long.

The cell extraction team was in and out of Larkin's cell in around two minutes. After successfully restraining him, the team promptly took Larkin to a decontamination shower to rinse off the OC spray. Following decontamination, the team took him to medical, where medical staff cleaned the wound and sutured it. After treatment, the team returned Larkin to his cell, removed his restraints, and exited his cell without issue. The Internal Affairs Officer with Investigations and Intelligence discovered that the cell extraction was not completely recorded while reviewing the video the following morning.

---

[1] The uncensored versions can be heard in the redacted cell extraction video or read in Ex. C., Lieutenant Bradford's declaration.

Larkin filed suit on August 20, 2018, and this Court screened his complaint on May 6, 2019. Upon screening, this court allowed the following claims to proceed: (1) an Eighth Amendment claim of excessive force against Defendant Eakins for repeatedly pepper spraying Larkin; (2) an Eighth Amendment claim of excessive force against Defendants Bradford, Talbot, Krause, Bach, Ryan, Armstrong, and Eakins; and (3) an Eighth Amendment failure to intervene claim against Bradford, Talbot, Krause, Bach, Ryan, Armstrong, and Eakins. Defendants now move for summary judgment on all claims.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Defendants provide the following statement of material facts not in dispute for the purposes of summary judgment only:

1.      On April 10, 2018, Larkin was incarcerated at Westville Correctional Facility in the Control Unit in cell A7-106. [ECF 1 at 4, ¶ 11.]

2.      Early in the afternoon that day, the facility's emergency squad ("E-squad") shook down Larkin's cell by removing him from his cell, securing him in the shower area for a visual body cavity strip search, and moving him to the indoor recreation pad to wait with other inmates while the E-squad searched Larkin's cell. [ECF 1 at 4, ¶¶ 18, 21–23.]

3.      Two E-squad officers took Larkin back to his cell, where Larkin became irate because items were missing from his cell. [ECF 1 at 5, ¶¶ 24–28.]

4.      Larkin "gun[ned] down" Officer McGowan with water to try and get Defendant Armstrong's attention. [ECF No. 1 at 5, ¶ 8, Ex. B at 14.]

5.      At the time of the incident, Defendant Armstrong was the field commander for the E-squad. [Ex. D (Decl. of Capt. Armstrong) at 1, ¶ 2.]

6.     Throwing an unknown liquid on staff constitutes battery on staff. The policy at the time dictated that whenever an offender threw an unknown liquid on staff, the offender would be ordered to submit to mechanical restraints so that officers could place the offender on "strip cell" status for 24 hours. [Ex. B (Decl. of Lt. Eakins) at 1, ¶ 3.]

7.     Strip cell status meant removing all items from the offender's cell that could be used to harm either himself or staff. [Ex. B at 1–2, ¶ 3.]

8.     The purpose of placing an offender on strip cell status after throwing unknown liquid on staff was twofold. First, it ensured that any item the offender could use to collect and throw liquid got removed from the offender's cell. Second, it served as a corrective measure to deter the offender from assaulting staff with unknown liquids again in the future. [Ex. B at 2, ¶ 4.]

9.     If an offender refused to submit to restraints, then a cell extraction team would be assembled to remove the offender from his cell. [Ex. B at 2, ¶ 3.]

10.     Defendant Eakins assembled a cell extraction team for Larkin because he refused to submit to mechanical restraints after throwing liquid on Officer McGowan. [Ex. B at 1, ¶ 2; Ex. A at 9:9–14.]

11.     Even if Offender Larkin's cell had been shaken down for contraband earlier in the day, strip cell status for Offender Larkin still would have been warranted. Officers needed to remove any items that could be used to collect and throw liquid. [Ex. B at 2, ¶ 5.]

12.     Prior to the administration of OC spray and cell extraction, Defendant Eakins read the shift supervisor briefing to the cell extraction team to go over the protocol and plan. [Ex. B at 2, ¶ 6.]

13.     The cell extraction team consisted of Defendant Calvin Bradford, Defendant Michael Bach, Defendant Andrew Krause, Defendant Tim Ryan, and Defendant Jeffrey Talbot. [Ex. B at 6 (Recorder Notes).]

14.     Sergeant Bowen introduced the team for the camera, and then the team headed to Larkin's cell. [ECF 73 at 6; ECF 73 (Redacted cell extraction video) at 2:50–3:53.]

15.     Sergeant Bowen gave the first order to "cuff up" at 2:38 p.m., and Larkin refused. Sergeant Bowen then administered a burst of OC spray. [Ex. B at 6; ECF 73 at 4:04–4:24.]

16.     Sergeant Bowen gave the second order to "cuff up" at 2:48 p.m., and Larkin refused. Sergeant Bowen then administered a second burst of OC spray. [Ex. B at 6; ECF 73, Redacted cell extraction video at 13:32–13:46.]

17.     Sergeant Bowen gave the third order to "cuff up" at 2:58 p.m., and Larkin refused. Sergeant Bowen then administered a third burst of OC spray. [Ex. B at 6; 14 (Bowen Use of Physical Force Report).]

18.     Larkin refused all orders to submit to mechanical restraints. [Ex. A at 6, 18:18–21.]

19.     While Sergeant Bowen administered the OC sprays, Larkin collected the OC spray in a bag. [Ex. A at 7–8, 24:17-25:4.]

20.     Larkin did not see who administered the three OC sprays because his cell door was covered. [Ex. A at 16:22–17:1.] One of his cell neighbors told him it was Defendant Eakins. [Ex. A at 17:24–18:4; Ex. A at 37:21–22.] Defendant Eakins did not administer any of the OC sprays. [Ex. B at 3, ¶ 10.]

21.     As a part of the staggered escalation of use of force, offenders are ordered to submit to mechanical restraints and, if they refuse, officers will administer OC spray to attempt to gain compliance before resorting to a cell extraction. [Ex. B at 3, ¶ 11.]

22.     The cell extraction team entered Larkin's cell at 3:12 p.m. [Ex. B at 6.]

23.     The last member of the team entered Larkin's cell at 3:12:37 [ECF 73, TASER video, 0:01.[2]]

24.     When the cell extraction team opened Larkin's cell door, Larkin squeezed the bag of OC spray under his arm and against his side to propel the OC spray at the team. [Ex. C (Decl. of Lt. Bradford) at 2, ¶ 5.]

25.     Larkin was immediately physically combative and actively tried to fight the team. [Ex. C at 2, ¶ 6.] Larkin testified that he grabbed Defendant Bradford to throw Defendant Bradford behind him. [Ex. A at 7, 23:1–2, 23:7–8.]

26.     The TASER video stops after 50 seconds, or at 3:13:27, immediately after someone yells "hands secure." [ECF 73, TASER video, 0:50.]

27.     The team first applied restraints to his hands, and then the team applied restraints to his legs. [Ex. C at 2, ¶ 7.]

---

[2] The TASER video indicates the time was 20:12:37, but this is likely UTC time (commonly used by police and military) and currently UTC time is five hours ahead of central time. *See* https://www.timeanddate.com/worldclock/timezone/utc. Westville, IN is in the central time zone.

28.    While the team had to use physical force to restrain and secure Larkin, the team did not use more force than necessary to accomplish this. [Ex. C at 2, ¶ 7.]

29.    As soon as restraints were on both his hands and legs, the team assisted Larkin to his feet to escort him out of his cell and to the decontamination shower. [Ex. C at 2, ¶ 9.]

30.    The team exited his cell to take Larkin to the shower at 3:14 p.m. [Ex. B at 6.]

31.    As field commander of the E-squad, Defendant Armstrong would observe cell extractions to be ready to request activation of the E-squad should something go wrong during the cell extraction. [Ex. D at 1, ¶ 2.]

32.    During the cell extraction, Defendant Armstrong was standing in the control room in the center of the pod, around 20 yards away from Larkin's cell. The "pod" is name for a floor of the Control Unit. It is called a pod because the rooms on the floor are organized in an octagon shape, surrounding the control room in the middle. [Ex. D at 2, ¶ 3.]

33.    The control room is visible in the redacted cell extraction video at 4:41:



34.    Defendant Armstrong witnessed the administration of OC sprays. [Ex. D at 2, ¶ 4.]

35.    Defendant Armstrong did not have a clear view of Larkin or the cell extraction team while they were inside Larkin's cell from the control room. [Ex. D at 2, ¶ 3.]

36.    Defendant Armstrong did not order the cell extraction team to stop doing anything or otherwise intervene with the cell extraction because he could not see or hear anything inappropriate happening. [Ex. D at 2, ¶¶ 5–6.]

37.    For facility security reasons, policy dictated that Defendant Eakins remain in a secure location off pod during cell extractions. [Ex. B at 2, ¶ 7.]

38.    Defendant Eakins did not observe the cell extraction. [Ex. B at 3, ¶ 9]

39.    Generally, after receiving notice that an offender had been restrained, Defendant Eakins would leave the secure location to observe the team removing the offender from the pod so that Defendant Eakins could evaluate the offender's condition and the team's condition. [Ex. B at 3, ¶ 12.]

40.    While Defendant Eakins does not recall watching Larkin being removed from the pod to go to decontamination, it is very possible Larkin saw him watching the team taking him off the pod to the shower. [Ex. B at 3, ¶ 12.]

41.    Larkin testified that he remembered passing Defendant Eakins on the way to the shower. [Ex. A at 33:24.]

42.    The cell extraction team took Larkin to the decontamination shower immediately after the extraction and then to medical immediately after to treat his eyebrow. [Ex. B at 6, Ex. A at 10, 34:17–23.]

43.    Larkin's eyebrow got split open during the extraction, resulting in bleeding and requiring stitches. [ECF 72 at 7, 10; ECF 72-1 at 8–13.]

44.    Following a dental checkup, Larkin had a tooth extracted in December 2019, more than a year and a half after the cell extraction took place. [ECF 85 at 3–4.]

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence shows that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining the existence of a genuine issue of material fact, the court construes all facts in a light most favorable to the non-movant and draws all reasonable inferences in his favor. *Id.* at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* After drawing all reasonable inferences from the facts in favor of the non-movant, if a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which

are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). "[P]artial summary judgment can serve a useful brush-clearing function even if it does not obviate the need for a trial." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund.*, 778 F.3d 593, 606 (7th Cir. 2015). The substantive law underlying the claim defines which facts are material, and the Court should only refrain from granting the motion when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A pro se prisoner's attestations in a verified complaint are competent evidence for summary judgment and "must be credited." *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).

### ARGUMENT

Larkin brings his claim under 42 U.S.C. § 1983 ("Section 1983"). To prevail under Section 1983, a plaintiff must establish that the defendants deprived him of a constitutionally secured right and that the defendants were acting under the color of state law. *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003). Section 1983 does not grant substantive rights; however, it provides a conduit in which to vindicate constitutionally or statutorily conferred rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Therefore, a plaintiff must identify the constitutional right that was infringed in order to have an actionable claim under the statute. *Albright*, 510 U.S. at 271 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Liability can be based only on a finding of personal responsibility, which includes constitutional deprivation occurring at a defendant's direction or with his knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

For any Eighth Amendment claim of cruel and unusual punishment, the burden is on the plaintiff to first show that the alleged deprivation must be "sufficiently serious" in that it must "result in the denial of the minimal civilized measures of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations and citations omitted). A claimant must then show that a state actor "has created risk or inflicted pain pointlessly." *Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995). The plaintiff must show that the defendant charged with cruel and unusual punishment "must want to injure the prisoner or must know of and disregard a substantial risk that harm will befall the prisoner." *Id.* at 149. The prohibition on cruel and unusual punishment includes inflictions of pain or

unnecessary risk "'totally without penological justification.'" *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (citing *Hope v. Pelzer*, 536 U.S. 730, 737 (2002)).

The Eighth Amendment's prohibition on cruel and unusual punishment does not mean that a prison official may never use physical force on an offender. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). For the purposes of the Eighth Amendment, use of force is excessive "when it entails 'the unnecessary and wanton infliction of pain.'" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 f.3d 650, 667 (7th Cir. 2012) (quoting *Whitley v. Albers*, 475 U.S. 651, 670 (1986). "[T]he core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm." *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). "Several factors guide the inquiry of whether an officer's use of force was legitimate or malicious, including 'the need for an application of force, the relationship between that need and the force employed, and the extent of the injury suffered by the prisoner.'" *Id.* (citing *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). A prisoner is not required to suffer "serious injury" in order to bring an Eighth Amendment claim. *Id.* (citing *Hudson v. McMilian*, 503 U.S. 1, 4, 10 (2001).

I.   **The use of OC spray on Offender Larkin did not constitute excessive force and Defendant Eakins is entitled to summary judgment as a matter of law**

Because prison officials had a legitimate penological purpose for using OC spray on Larkin, and because Defendant Eakins did not administer the OC spray, Defendant Eakins is entitled to summary judgment as a matter of law.

"The use of mace is not a per se violation of the Eighth Amendment." *Soto v. Dickey*, 744 F.2d 1260, 1271 (7th Cir. 1984). The use of OC spray "is appropriate 'when reasonably

necessary . . . to subdue recalcitrant prisoners.'" *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (quoting *Soto*, 599 F.3d at 1270). The use of OC spray is an Eighth Amendment violation when prison officials use OC spray "in quantities greater than necessary or for the sole purpose of punishment or for the infliction of pain." *Soto*, 744 F.2d at 1270.

In *Soto*, the Seventh Circuit held that prison officials did not violate the Eighth Amendment by using mace on inmates who refused to obey orders to come to the front of the cell to be cuffed. *Id.* The officers ordered inmates to cuff up so the officers could remove meal trays or other items that could be used to throw liquid at staff. *Id.* This did not constitute excessive force because the officers had a legitimate reason for using mace. Critically, the court emphasized that prisons "must be concerned about the safety of its staff as well of its inmates. It has the duty to protect the staff from assaults. . . [including] by the throwing of objects or liquids on them." *Id.* at 1266–67.

Prison officials have limited options available to compel compliance with orders, and compliance with orders is crucial since an inmate's refusal to comply with orders "places the staff and other inmates in danger." *Id.* at 1267. "'[P]reserving internal order and discipline are essential goals'" and prison officials "must be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline to maintain institutional security." *Id.* at 1269 (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)).

Critically, because Defendant Eakins did not administer the OC spray, he cannot be personally liable for Plaintiff's claim that the use of OC spray constituted excessive force under the Eighth Amendment. The Eighth Amendment requires personal

responsibility for liability to attach. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Furthermore, the theory of supervisor liability does not give rise to Section 1983 liability. *See Burks v. Raemisch*, 555 F.3d 592, 593–94 (7th Cir. 2009).

Larkin testified that one of his cell neighbors told him Defendant Eakins administered the OC spray. [Ex. A at 17:24–18:4.] When asked whether he knew for sure that Defendant Eakins administered the OC spray, he responded "my window was covered." [Ex. A at 16:22–17:1.] The video shows that non-party Sergeant Bowen administered the first two OC sprays [ECF 73 at 1:46 (identifying himself); 4:04–4:24; 13:32–13:46], and the use of force report he submitted after the extraction confirms that he also administered the third OC spray [Ex. B at 14.] Furthermore, there is no evidence that Defendant Eakins directed Sergeant Bowen to use OC spray on Larkin in a manner that was unnecessary or in manner solely intended to cause pain.

Regardless of who administered the OC spray, the use of OC spray did not constitute an Eighth Amendment violation. Larkin testified that he refused to cuff up for the strip cell because he did not think he needed to be cuffed up or strip celled. [Ex. A at 5, 13:27–14:1, 14:14–19.] First, placing Larkin on strip cell status following his assault on Officer McGowan with water was undeniably justified, because as it turned out, Larkin had a container in his cell that he used to collect and launch the OC spray at the cell extraction team—*precisely* the type of assault that the strip cell intended to prevent by removing such items. [*See* Ex. B at 2, ¶ 4.] Second, there is no evidence that Sergeant Bowen used the OC spray in unnecessary quantities or for any other reason than to try to gain Larkin's compliance with orders to submit to mechanical restraints so that he could

14

be strip celled. Such a use of OC spray has a legitimate penological purpose in protecting staff and facility safety and security and promoting compliance with orders.

For the foregoing reasons, this Court should grant summary judgment in Defendant Eakins' favor for Plaintiff's claim that the use of OC spray constituted excessive force in violation of the Eighth Amendment.

## II.    The cell extraction was a justified, necessary use of force that did not violate the Eighth Amendment

As discussed in more detail above, placing Larkin on strip cell status to remove any items from his cell that could be used to assault staff with liquids was necessary and justified to protect staff safety, correct recalcitrant behavior, and promote future compliance with orders. Larkin refused to submit to mechanical restraints for a strip cell, which is why Defendant Eakins ordered a cell extraction. [Ex. B at 1, ¶ 2; Ex. B at 5.] The undisputed evidence shows that Sergeant Bowen gave Larkin multiple opportunities to comply with the orders to cuff up, and only after Larkin refused these multiple orders did the cell extraction team enter his cell and use reasonable force to restrain and secure Larkin.

The same excessive force analysis applies to both the use of OC spray and the use of cell extractions: the relevant inquiry is whether prison officials applied force "in a good-faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm." *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). "Several factors guide the inquiry of whether an officer's use of force was legitimate or malicious, including 'the need for an application of force, the relationship between that need and the force

employed, and the extent of the injury suffered by the prisoner.'" *Id.* (citing *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

### A. A greater application of physical force will be necessary to restrain an offender who is actively fighting a cell extraction team

The cell extraction team had to apply physical force to restrain and secure Larkin. [Ex. C at 2, ¶ 7.] When an inmate is fighting back and resisting, officers will necessarily have to use a greater amount of force to restrain and secure an inmate than if the inmate is not actively fighting back. While the TASER video does not show much beyond the team's feet and Larkin's feet, the audio does not reveal any sounds that would indicate Larkin was being hit repeatedly while pinned against the wall, that someone was dropping his knees into his ribs and back, or that someone was slamming his head into the ground after the team placed him on the ground. *See, e.g.*, *Davis v. Wright*, No. 3:94-cv-13-RM, 1996 WL 204492 (N.D. Ind. Feb. 14, 1996) (summary judgment granted for prison officials when the cell extraction video showed the inmate putting up "a violent struggle" and there were no sounds or movements suggesting the team beat or clubbed the inmate).

Larkin also alleges that some of Defendants beat him after being placed in restraints. The TASER video ends after a team member says "hands secure," at 3:13:37. After the team applied restraints to Larkin's hands, the team then applied restraints to Larkin's legs. [Ex. C at 2, ¶ 7.] As soon as the team had restraints on Larkin, the team assisted him to his feet and escorted him to the decontamination shower at 3:14 p.m. [Ex.

C at 3, ¶ 9, Ex. B at 6.] Larkin's allegations do not align with the sequence of events shown in the record.

Because the cell extraction had a legitimate penological purpose, and because Defendants did not use more force than necessary to restrain and secure Larkin, this Court should grant summary judgment on the Eighth Amendment excessive force claims.

> **B. Defendants Eakins and Armstrong did not participate in the cell extraction and are entitled to summary judgment as a matter of law on Plaintiff's excessive force claims against them**

Larkin clarified in his interrogatory responses that his allegations against Defendant Armstrong is that he "let [Larkin] get assaulted. . . he gives [the e-squad] orders so he let me get beat doing nothing to stop or prevent." [Ex. E at 15, Resp. 19.] Larkin does not allege that Defendant Armstrong actually participated in the cell extraction or applied excessive force himself. Nor can he—Defendant Armstrong was in the control room during the cell extraction. [Ex. D at 2, ¶ 3.] There is no evidence that Defendant Armstrong directed the cell extraction team on how to conduct the cell extraction, let alone any evidence that he directed them to use more force than necessary to restrain Larkin. Accordingly, this Court should grant summary judgment in Defendant Armstrong's favor on the excessive force claim.

Larkin also clarified in his deposition that his allegation against Defendant Eakins is that he watched the cell extraction take place and did not stop the alleged assault. [Ex. A at 10, 33:8–24.] With respect to the cell extraction, he does not allege that Defendant Eakins applied any force during the extraction. Larkin also does not allege that Defendant

Eakins instructed or ordered the cell extraction team to use force in excess of what was necessary to restrain Larkin. Finally, Larkin does not allege that Defendant Eakins ordered the cell extraction team to conduct the cell extraction for any reason other than for a legitimate penological purpose of conducting a strip cell following an assault on staff with liquid. As such, this Court should grant summary judgment in Defendant Eakins' favor for the excessive force claim.

### III. All Defendants are entitled to summary judgment on the failure to intervene claim

A correctional officer that has a realistic opportunity to prevent another officer's violating of an offender's rights through the use of excessive force, and chooses not to do so, may be held liable under § 1983. *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004). A claim of failure to intervene requires evidence of the following: (i) the defendant knew of the unconstitutional conduct; (ii) the defendant had a realistic opportunity to prevent the harm; (iii) the defendant failed to take reasonable steps to prevent the harm; and (iv) the plaintiff suffered harm as a result. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994). Whether state actors fail to intervene depends on whether the defendants "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

While excessive force claims and failure to intervene claims are legally distinct, they are "closely linked" because "by definition, if there was no excessive force then there can be no failure to intervene." *Abdullahi v. City of Madison*, 423 F.3d 763, 767-68 (7th Cir. 2005). If this Court finds that the cell extraction did not constitute excessive force, then

summary judgment in Defendants' favor for the failure to intervene claims will also be warranted.

Furthermore, Defendants Eakins and Armstrong are entitled to summary judgment as a matter of law because they did not see the cell extraction team restrain Larkin and accordingly could not know whether the team used an unconstitutional amount of force. Defendant Eakins was off the pod in a secure location in accordance with policy, [Ex. B at 2, ¶ 7], not watching from the inside recreation pad or on the range as Larkin alleges. Larkin said that Defendant Eakins saw the entire thing, because Larkin remembered passing him on the way to the shower. [Ex. A at 10, 33:19–24.] But, just because Larkin saw Defendant Eakins as he went to the shower for decontamination does not mean that Defendant Eakins was present for the cell extraction. While Defendant Eakins does not specifically recall watching Larkin being removed from his cell, he admits this is very possible because generally, he would leave his secure location to observe the team removing the offender from the pod so that he could evaluate the offender's condition and the extraction team members' conditions. [Ex. B at 3, ¶ 12.]

Defendant Eakins did not observe the cell extraction. [Ex. B at 3, ¶ 9.] Defendant Armstrong was in the control room about 20 yards away during the cell extraction, but he did not have a clear view into Larkin's cell and he could not see and did not hear anything indicating that the team was violating cell extraction protocol or doing anything inappropriate. [Ex. D at 2, ¶¶ 5–6.] To be liable under Section 1983, Defendants Eakins and Armstrong must have known that a constitutional violation was happening *and* had reasonable opportunity to intervene. Neither of those conditions can be met when

19

Defendant Eakins did not observe the cell extraction, Defendant Armstrong could not clearly see the cell extraction team, and Defendant Armstrong did not see or hear anything inappropriate. This Court should grant summary judgment in favor of Defendants Eakins and Armstrong on Plaintiff's failure to intervene claim.

## IV. Defendants are entitled to qualified immunity

Because it is not clearly established that the Defendants' actions violated the Constitution, this Court should find that Defendants are entitled to qualified immunity.

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The court must determine whether "a reasonable [government actor] could have believed that [her] conduct was constitutional 'in light of the clearly established law and the information [she] possessed' at the time" of the incident. *Ellis v. Wynalda*, 999 F.2d 243, 246 (7th Cir. 1993) (quoting *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992)). Since qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," courts must determine whether a defendant is entitled to qualified immunity as early as possible during the proceedings. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

There are two aspects to the inquiry: (1) whether the official's actions violate the Constitution, and (2) whether the constitutional right was clearly established at the time of the official's alleged misconduct. *Abbott v. Sangamon County., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). A court may decide that a government official did not violate clearly

20

established law and hold that the official is entitled to qualified immunity without deciding whether the official's actions violated the Constitution. *Pearson v. Callahan*, 555 U.S. 223, 239 (2009).

The plaintiff bears the burden of demonstrating the violation of a clearly established right. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). Clearly established law should not be defined at a high level of generality. *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). A violation is "clearly established" *only* when "(1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution." *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2011). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### A.  It is not clearly established that the use of OC spray gave rise to a constitutional violation

While the use of OC spray in this case did not violate the constitution for the reasons described in Part I, this Court can decide that Defendant Eakins did not violate clearly established law without reaching the question of whether Defendant Eakins violated the Constitution. It is not clearly established that a state actor, especially one who does not even administer the OC spray at issue, violates the Constitution by administering OC spray in response to an inmate's refusal to comply with orders to submit to mechanical restraints so that the inmate's cell can be stripped following an assault on staff. In fact, clearly established case law set forth in Part I provides that the

use of OC spray does not violate the Eighth Amendment so long as prison officials use it in good faith, for a legitimate penological purpose, not in excessive quantities, and not solely to inflict pain. Consequently, Defendant Eakins is entitled to qualified immunity for Larkin's claim that the use of OC spray constituted excessive force in violation of the Eighth Amendment.

### B. It is not clearly established that performing a cell extraction of an inmate who had assaulted staff and who was subsequently refusing orders gave rise to a constitutional violation

Likewise, it is not clearly established that performing a cell extraction of an inmate who refused to comply with orders to submit to mechanical restraints so that officers could search and remove items that could be used to harm himself or staff constituted an Eighth Amendment violation. *See, e.g., Dye v. Lomen*, 40 F. App'x 993, 996 (7th Cir. 2002) (prison officials did not use physical force maliciously or sadistically to cause harm when officials restrained him and used a stun gun so that the inmate would not injure the officials or himself); *Boyd v. Pollard*, 621 F. App'x 352, 355–56 (7th Cir. 2015) (where a video did not clearly show the events transpiring during a cell extraction, and the parties told different versions of what happened outside the camera's view, summary judgment was warranted because no juror could reasonably conclude that "given the professional behavior of the guards and minor injury. . . that the guards attacked Boyd outside of the camera's view" and Boyd's allegations of being "bodyslammed onto a concrete floor" and sustaining "numerous blows to his head and face" did not match his actual injury of a small laceration above his eye); *Davis v. Wright*, No. 3:94-cv-13-RM, 1996 WL 204492 (N.D. Ind. Feb. 14, 1996) (summary judgment granted for prison officials when, although

the video did not clearly show what happened, the video did show the inmate putting up "a violent struggle" requiring all five cell extraction team members to subdue him and there were no sounds or movements suggesting the team beat or clubbed the inmate and no evidence supported a finding that the officers acted maliciously or sadistically to cause harm). And if it is not clearly established that the cell extraction team members' actions constituted an Eighth Amendment violation, then it is also not clearly established that the cell extraction team members failed to intervene. *See Abdullahi v. City of Madison*, 423 F.3d 763, 767-68 (7th Cir. 2005). Defendants are entitled to qualified immunity on the excessive force and failure to intervene claims related to the cell extraction.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of Defendants for all of Plaintiff's claims.

Respectfully submitted,

OFFICE OF THE INDIANA ATTORNEY GENERAL

By:  Courtney L. Abshire
Deputy Attorney General
Attorney No. 35800-49
*Counsel for Defendant*

23

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. I further certify that on September 18, 2020, I mailed, by United States Postal Service, first-class postage prepaid, the document to the following non-CM/ECF participants:

James Larkin
DOC #206339
Indiana State Prison
1 Park Row
Michigan City, IN 46360

By:    Courtney L. Abshire
       Deputy Attorney General

OFFICE OF THE INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Fl.
302 West Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-7019
Fax:    (317) 232-7979
E-mail: Courtney.Abshire@atg.in.gov